# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs September 3, 2014

## MICHAEL JOHN STITTS v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Madison County**
**No. C-13-222      Roy B. Morgan, Jr., Judge**

---

**No. W2013-02550-CCA-R3-PC  - Filed September 16, 2014**

---

A Madison County jury convicted the Petitioner, Michael John Stitts, of theft of property valued between $1,000 and $10,000. The trial court sentenced the Petitioner to serve six years in confinement. On direct appeal, this Court affirmed the Petitioner's conviction and sentence. *State v. Michael John Stitts*, W2011-02673-CCA-R3-CD, 2013 WL 257069, at *8 (Tenn. Crim. App., at Jackson, Jan. 23, 2013), *no Tenn. R. App. P. 11 application filed*. The Petitioner filed a petition seeking post-conviction relief, claiming that he had received the ineffective assistance of counsel. After a hearing, the post-conviction court denied the Petitioner relief. The Petitioner appeals this denial, maintaining that his attorney was ineffective. After a thorough review of the record, the briefs, and relevant authorities, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which ALAN E. GLENN and ROBERT L. HOLLOWAY, JR., JJ., joined.

J. Colin Morris, Jackson, Tennessee, for the Appellant, Michael John Stitts.

Robert E. Cooper, Jr., Attorney General and Reporter; Tracy L. Alcock, Assistant Attorney General; James G. Woodall, District Attorney General; and Rolf Hazlehurst, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION
### I. Facts
### A. Trial

On direct appeal, this Court provided the following summary of the evidence

presented at trial:

Charles [FN1] Ohonba testified that his wife, Lola's, car broke down when he was driving home to Jackson from Memphis. A mechanic from AutoZone looked at the vehicle and determined that it needed a new motor and recommended the [Petitioner] to install it. The [Petitioner] stopped by the Ohonbas' house, examined the car, and agreed that it needed a new motor. The [Petitioner] told Charles that he would do the job for $625 and that the car would be ready in three days.

> FN1. Because two of the witnesses have the same surname, we will refer to them by first name for clarity. We mean no disrespect by this practice.

Because Charles needed the car right away, he gave the [Petitioner] $300 to begin work on the car. The [Petitioner] had the car towed from the Ohonbas' residence, but Charles did not know to where the car was towed. Charles met with the [Petitioner] the following week, but the [Petitioner] told him that the car was not ready and that he needed the remaining $325 to complete the work. The [Petitioner] collected the $325 from Charles early the following month. Thereafter, every time Charles contacted the [Petitioner] to check on the status of his car, the [Petitioner] gave him a number of excuses as to why the car was not ready.

Charles said that the [Petitioner] never told him that he was going to sell the car to a salvage yard, and he never consented for the [Petitioner] to do so. The [Petitioner] did not return the money Charles paid to have the car repaired or give him any of the money from the sale of the car. He said that he did not sell the car to the [Petitioner]. He recalled that the [Petitioner] came over to his house two times, both times to get money from Charles, and Lola was present when he paid the [Petitioner] $325. Charles stated that he eventually called the police and learned from an investigator that the [Petitioner] had sold his car to a salvage yard.

Two receipts were admitted as exhibits at trial. On the first, the [Petitioner] handwrote, "Full amount $625.00. Charles Ohonba paid $300.00 down on getting a motor install[ed] in his 1999 Ford Taurus station wagon. He owe[s] a balance of $325.00 to [the [Petitioner]]." The receipt was dated July 13, 2010. The second receipt indicates that Charles paid the [Petitioner] $325 "for his engine & parts" on August 14, 2010.

-2-

Lola Ohonba testified that she met the [Petitioner] when he came to her and Charles' home to collect the balance owed for repairing her car. The [Petitioner] had already taken the car after the first payment. Lola said that she was the lawful owner of the 1999 Ford and produced a certificate of title reflecting her ownership. She recalled that she purchased the vehicle in 2008 for $12,000. She said that she did not sell her car to the [Petitioner] or consent to him taking the car to the salvage yard. The [Petitioner] did not return her car or the money that was paid to repair it, or give her the money he received from selling the car to the salvage yard.

Officer Lucille Ellen Williams with the Jackson Police Department testified that the Ohonbas contacted the police on August 28, 2010, regarding a possible theft. She took a suspicious situation report, but no charges were brought because it was not known at the time that the car had been sold to a salvage yard.

Elaine Robbins, office manager at Hutcherson Metals, identified several documents showing that the [Petitioner] sold them a 1999 Ford Taurus. The first document was the weigh ticket, which indicated that the [Petitioner] brought in a car, as well as the gross, tare, and net weight. The ticket also included the [Petitioner]'s signature, phone number, and right thumbprint. The ticket showed that Hutcherson purchased the vehicle for $384.80. The second document was a motor vehicle bill of sale the defendant submitted to Hutcherson, affirming that he was the legal and lawful owner of the vehicle—a 1999 Ford and its vehicle identification number ("VIN").

The third document was the yard ticket, which was completed by the guard. The ticket showed, among other things, the make and VIN number of the vehicle, the tag number, and the date and time the transaction occurred- October 20 at 1:45. It also contained a signature line where the [Petitioner] indicated that he was the lawful owner of the materials being sold. The fourth document was a copy of the check issued to the [Petitioner] in the amount of $384.80, bearing the [Petitioner]'s thumbprint. The fifth document was a copy of the [Petitioner]'s Tennessee identification card.

Robbins testified that she was subsequently contacted by the Jackson Police Department regarding a possible stolen vehicle and was provided with a VIN number. Robbins used that VIN number to locate the ticket and pull up the [Petitioner]'s information. She said that the [Petitioner] represented himself to be the lawful owner of the car.

Investigator Steve Pope with the Jackson Police Department was assigned to investigate the suspicious situation report involving the Ohonbas' vehicle. After talking to Charles, he began searching for the car in the scrap yards, "the first and most obvious place[.]" He contacted Hutcherson Metals, where a match was located to the VIN number on the Ford belonging to Lola and a vehicle sold for scrap by the [Petitioner]. Robbins provided him with the supporting documents demonstrating that the [Petitioner] had sold Lola's car to Hutcherson for scrap metal.

Investigator Pope said that the VIN number on the motor vehicle bill of sale and the yard ticket provided by Robbins matched the VIN number on the certificate of title provided by Lola. In addition, the fingerprint on the scanned check matched the [Petitioner]'s fingerprints.FN2 Investigator Pope stated that, given the totality of the circumstances, it was his opinion that the [Petitioner]'s "intent from the beginning was to permanently deprive the Ohonbas of the vehicle." He uncovered no evidence in the course of his investigation that the Ohonbas transferred title of their vehicle to the [Petitioner].

> FN2. The [Petitioner] stipulated that his fingerprints were on the documents from Hutcherson.

[The Petitioner]'s Proof

Gerald Taylor testified that he did "mechanic work" for the [Petitioner] and that, in July 2010, he helped the [Petitioner] pull the motor out of a 1999 Ford Taurus. Taylor admitted that he did not help the [Petitioner] try to fix the motor, or see the [Petitioner] try to fix the motor or the car.

The [Petitioner] testified that he met the Ohonbas in July 2010 when he assessed their car for repairs, determining that it needed a new motor. He denied telling Charles that he would have the car repaired in three days. He said that Charles paid him $300 to remove the engine and cover the "wrecker fee," but that he had to wait for Charles to pay the balance of $325 before he could buy the new engine. After receiving the $325, he began looking for the replacement motor.

The [Petitioner] testified that, sometime in October, Charles became frustrated that the [Petitioner] had not yet found a replacement engine and

-4-

asked the [Petitioner] to sell the car to a salvage yard. Charles told the [Petitioner] that he would use the money from salvage and money paid to the [Petitioner] for the repair to buy another car. The [Petitioner] subsequently went to the courthouse, picked up a bill of sale, and signed it because Charles had given him permission to sell the car as scrap. After selling the car to Hutcherson, the [Petitioner] called Charles to inform him that the car had been sold but was unable to reach him. The next time the [Petitioner] heard from Charles was through the police.

The [Petitioner] agreed that the money Charles paid for the repair, as well as the money from the sale to the salvage yard, should be given to Charles. The [Petitioner] identified the documents from Hutcherson regarding the sale of the Ohonbas' vehicle. He claimed that his fiancée, Mary Ann Greer, was present when Charles gave him permission to sell the car. The [Petitioner] maintained that his intention was to fix the car until Charles asked him "to salvage the car for him[.]"

The [Petitioner] acknowledged that he had prior felony convictions for assault and evading arrest but said that he had never stolen anything. On cross-examination, he admitted that he was convicted of aggravated assault on July 30, 2001, and sentenced to nine years; he pled guilty to two counts of aggravated assault on October 15, 1992, and was sentenced to six years; and he pled guilty to reckless endangerment on October 15, 1992, and was sentenced to two years.

The [Petitioner] examined the two handwritten receipts given to Charles and acknowledged that he wrote the terms of agreement. He also acknowledged that there was no documentary proof that the Ohonbas transferred title of the car to him. He admitted that he was not the lawful owner of the Ohonbas' vehicle, even though he represented himself as such to Hutcherson.

Mary Ann Greer, the [Petitioner]'s live-in girlfriend, testified that she was not physically present when Charles and the [Petitioner] talked about scrapping the vehicle, although she heard the [Petitioner]'s side of the telephone conversation.

*Stitts*, 2013 WL 257069, at *1-4. After hearing this evidence, the jury convicted the Petitioner of theft of property valued between $1,000 and $10,000. The trial court sentenced the Petitioner to serve six years in confinement for this conviction.

## B. Post-Conviction

The Petitioner filed a post-conviction petition asserting that he had received the ineffective assistance of counsel.[1] The trial court held a hearing where the parties presented the following evidence: The Petitioner's trial attorney, ("Counsel"), testified that she was retained to represent the Petitioner in March 2011, after the Petitioner's arraignment. Counsel stated that she met with the Petitioner and reviewed discovery with him. She recalled that she had informed the Petitioner that the victims were requesting restitution in the amount of $2,009.80. Counsel said that the State had originally offered a four-year sentence of probation "as long as [the Petitioner] paid restitution." The Petitioner declined this offer because he believed the case "should have been a civil case." Counsel stated that she attempted to relay to the jury that it was the opinion of Officer Williams, who testified at trial, that this case was a civil matter.

Counsel testified that, on numerous occasions, she explained to the Petitioner that, despite the police officer's opinion, the investigator assigned to the case had proceeded with prosecution of the case and the Petitioner had been indicted for the offense. Counsel stated that, at trial, she relayed to the jury that the Petitioner had permission to have the vehicle based upon an agreement to repair it and that the victims had made two payments toward the repair work. Counsel described the victims as "unassuming innocent people" who were "credible" witnesses.

Counsel testified that her trial strategy did not focus on the value of the vehicle because the Petitioner's position was that he did not steal the vehicle. Counsel agreed that had the jury found the value of the vehicle at $385, the amount the Petitioner received for the vehicle, the conviction would have been a misdemeanor rather than a felony. She explained that the Blue Book value for the car at the time was $1,100, so the jury had evidence supporting a conviction for theft of property valued over $1,000. Counsel confirmed that the trial court instructed the jury as to the lesser-included offenses which included misdemeanor theft. Counsel stated that she believed that she had done "everything that [she] possibly could have done" to convey the Petitioner's position to the jury.

On cross-examination, Counsel agreed that Ms. Ohonba, one of the victims, testified that she paid $12,000 for the vehicle in 2008. Counsel stated that she did not believe there was anything else she could have done differently that would have affected the outcome of

---

[1] In his petition, the Petitioner asserted several claims for post-conviction relief. On appeal, however, he maintains only his claim of ineffective assistance of counsel. Therefore, we include only the facts from the hearing that are relevant to this claim.

this case.

The Petitioner testified that, from the onset, he believed this case was a civil rather than criminal matter because he and the victims had entered a contract. He stated that Counsel never conducted research on "the civil issue." The Petitioner agreed that he had "scrap[ped]" the victims' car and received $384.80 from the sale. He explained that he did so at the victim's, Mr. Ohonba's, request. The Petitioner was unsure as to whether or not he had actually notified the victim of the money he received or the victim had already reported the vehicle missing to the police. He stated that he offered the victim "a little more" than the amount he received but that the victim refused the offer.

The Petitioner testified that the victim reported the vehicle's worth at $500 initially. Investigator Pope, however, secured a warrant based on the value of the property being over $1,000. The Petitioner said that Counsel was ineffective in persuading the jury of an accurate value for the vehicle. He maintained that the victims' vehicle, a 1999 Ford Taurus station wagon, was worth the amount paid by the salvage yard, $384.80.

The Petitioner testified that initially he was employed to replace the engine in the victims' Taurus. The Petitioner recalled that he charged $625 to make the repairs on the vehicle. The victims gave him $300 as a down payment. Once the Petitioner found the motor needed, he notified the victims and then waited for the remainder of the payment. The victims did not pay him until the following month. At that time, the "junk yard" no longer had the engine, so the Petitioner had to wait until the junk yard had another engine. At this point, the Petitioner had towed the vehicle to his shop and pulled the existing engine out of the vehicle. The victim called the Petitioner and told him he had "changed his mind" and asked the Petitioner to "scrap" the vehicle for him. The Petitioner said that there was no written agreement as to the "scrapping" of the vehicle, only the initial agreement that referenced the replacement of the engine. The Petitioner maintained that if Counsel had "did her research" she would have better presented his case as a civil matter to the jury.

After hearing the evidence, the post-conviction court issued an order denying relief. It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that he received the ineffective assistance of counsel because Counsel failed to "place enough emphasis on the value of the automobile involved in this case." He maintains that the value of the victims' vehicle was $384.80, the amount the salvage yard paid him for the vehicle. The State responds that the Petitioner has failed to show by clear and convincing evidence that Counsel's representation was deficient.

We agree with the State.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2012). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2012). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997)). A post-conviction court's factual findings are subject to a *de novo* review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely *de novo* review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's

representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a petitioner in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n .38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

If a petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the Strickland test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

As to the Petitioner's claim regarding the value of the car, the post-conviction court noted that, on direct appeal of the conviction, this Court found sufficient evidence to support the conviction for theft of property valued over $1,000. The post-conviction court also noted that the jury was "properly charged all the way down to the possibility they could find the value of the vehicle less than $500 if they wanted to." The post-conviction court concluded that the Petitioner had not shown by clear and convincing evidence that Counsel was ineffective in this regard.

We conclude that the record does not preponderate against the post-conviction court's

findings. Counsel testified that she did not focus on the amount of the vehicle because the defense theory of the case was that the Petitioner had not stolen the vehicle. She stated that, even so, the Blue Book value of the vehicle was $1,200. As the trial court correctly noted, this Court affirmed the Petitioner's conviction for theft of property over $1000, finding sufficient evidence was presented to the jury that the value of the car was valued over $1000. *Stitts*, 2013 WL 257069, at *4. Moreover, the jury was charged with the lesser-included offenses and, by its verdict, discredited the value the Petitioner received from the salvage yard from the sale of the vehicle as the value of the vehicle. Accordingly, the Petitioner has not proven by clear and convincing evidence that Counsel's representation was deficient or that he was prejudiced by the alleged deficiency. The Petitioner is not entitled to relief.

## II. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the post-conviction court properly denied post-conviction relief. Accordingly, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE

-10-